Good morning, Your Honors. May it please the Court, my name is Ann Palmer. I am joined by co-counsel Dallin Marcy. We are students with the Law School of the University of Arizona, supervised by Dr. Willie Jordan Curtis. We represent Appellant Paul Guidry, who is present in the courtroom today. With the Court's permission, we'd like to reserve two minutes for rebuttal. Okay. Thank you. I will address the discrimination issues. Mr. Marcy will address MEBA's breach of its duty of fair representation. Okay. Mr. Guidry is a long-term union member, certified by the U.S. Coast Guard, who has been dispatched to numerous third assistant engineer jobs in the past. This action arose after he was dispatched to the overseas Cascade in 2010. He immediately turned over his original passport, showing him to be African American. Thereafter, he waited an extraordinary amount of time to be actually boarded the ship. All right. Can you explain to me, is your theory of discrimination that the union discriminated against him on the basis of race, or is it that the union somehow didn't prevent the employer from discriminating against him on the basis of race? Which is it? The union didn't prevent the employer. Is that a cause of action? Is that a Title VII cause of action? The union has a duty of fair representation, and the duties allow it. That's the duty of fair representation, but is it a Title VII cause of action? If the employer, whatever it's doing, isn't doing it because of race? If the union was aware of the intent and did nothing to stop it, then, yes, it is a cause of action. And why? It's complicit in the discrimination, the union. Uh-huh. Well, what did the union do, exactly? Well, frankly, nothing. The union did nothing to stop the discrimination. Did the union have anything to do with the whole visa problem? I'm sorry? Did the union have anything to do with the whole visa problem? That's more of a fair representation problem, which Mr. Marcy will discuss, but the union failed to do anything to follow up on why it wasn't occurring. And the main one of the main issues is the disparate. Did he ever come during that whole period to the union, even when he filed his grievance and say that the company is discriminating against me on the basis of race? I mean, he had a lot of complaints, but he never stated that it's because of race. Yes, absolutely. When? In the record. Where does the record show that? Unfortunately, I believe it's more implied than actually stated. Okay. So he never did say it. He never said it. His grievance certainly was based on race. I thought his grievance said, you know, I've been waiting for so long and so on. But did it ever say they did this to me because of race? He's numerous. I know later he did, but up to the point that he actually was dispassionate and would have gotten the job except that he threw it back, did he ever do it? Did he ever say it was because of race? I don't think he said that directly. What he was pointing out to MEBA was the disparate treatment. For instance, his original passport was confiscated at the time he was dispatched in November. Matthew Beliza, who is a Caucasian MIBA member, was permitted to keep his original passport. He was dispatched 10 days after he filed his Brazilian work visa application to a different ship. He was able to earn a living in the intervening days between filing his application for a visa. And did the union – was the union the one that said that he had to give them their passport and then kept it? The union confiscated his passport. Well, the union was told that he needed to get the passport. They gave him the passport. They sent it to the company, and that was the end of it, right, as far as the union was concerned? The union has practices under a two-phase system. The first is fill out the application, and the second is the collection documents, where they have to turn over their original passport. That occurs months later. In Mr. Guidry's case, it – Well, and it appears there was a screw-up. It does appear that way, but it doesn't – but was the union responsible for it? Well, even the union's investigator, Patrick Anderson, sent a letter to OSG saying that having him confiscated his passport and not be able to work for 90 days was unacceptable. That was MIBA's investigator. Help me understand. I'm working on the same problem that Judge Berzon is, and we're taking you over time. Yes. So we'll deal with time with your co-counsel and so on. I'm having trouble figuring out, given that the union is the defendant on the discrimination claim, precisely what it is that the union did that was wrong. It sounds as though the allegation and the proof we have is not that the union was an active participant in the discrimination. It's rather, as you stated, that they knew or should have known that discrimination was going on at the company end, and they did nothing to stop it. Correct. Do you have case law that tells us that a union in that situation is liable under Title VII? Well, all the case law falls under – not under Title VII. All the case law falls under the duty of fair representation. And MIBA's policy was not to allow discrimination, whether by MIBA or by the employers. That was their policy. Okay. So it may be that we should be moving on then to duty of fair representation.  whatsoever that any union officer and any officer of the employer conspired to keep Mr. Guidry off the ship? There are inferences, but no direct evidence that we've uncovered. Any meetings between the two that are supposed to have dealt with Guidry, any conversations that have been reported saying, let's keep Guidry off the ship because he's black? Not directly, no. All right. Thank you. Thank you, Your Honor. Okay. Mr. Clerk, if you would reset the clock to six minutes, that will be the time that was at least set out as the aspiration. So you'll get four minutes and then try to save the two minutes for rebuttal that was requested.  Thank you, Your Honor. May it please the Court, Your Honors, I am Dallin Marcy. I am also a student from the University of Arizona Law School. And to really give a context to what we're talking about here, this is an appeal for a motion of summary judgment. And so all Mr. Guidry needs to prove here is that there is some genuine issue of material fact for this to be remanded back to the district court. So he doesn't need to prove his case in its entirety here, just that there's some issue that was not dealt with. So in what respect do you argue that the union failed in its duty of fair representation? Well, the union's duty of fair representation, as has been set out by the Supreme Court and as this Court has discussed, is an absolute duty to represent its members in every aspect of hiring and employment. It's a duty that exists... No, we got that. My question is specific to this case. In what respect did the union fail in its duty? The union started to fail in its duty when Mr. Guidry was not dispatched to the ship and the union did nothing to investigate why that didn't happen. So Mr. Guidry, if we look at the facts, Mr. Guidry was never contacted in December about whether he was going to be dispatched to the ship. Well, but every time he went in and said there's a problem, the union did do something, right? I mean, the union didn't proactively realize that he hadn't been shipped off. But when he came in several different times and said there was a problem, they did do something. That is correct. But each time it was Mr. Guidry who had to go in, he had to initiate some action. Well, why wouldn't it be? I mean, when you represent somebody, you have to know what they want, and they come in and he says that. I mean, they don't go around trying to figure out whether he's been shipped or not. They dispatched him. They did what they needed to do with the employer, and they didn't know there was a problem until they told him there was a problem. And so they didn't know there was a problem until the first time he told them there was a problem. But they knew in December that he hadn't been dispatched. Okay. And so from December until February, that entire period of time, MEBA did not advocate on his behalf until Mr. Guidry essentially went in, frauded them, and said, hey, I'm still not dispatched. And then MEBA would be, oh, well, I guess we should do something about this. What about the, as it were, post hoc investigation? I mean, he filed a grievance, and then there's an investigation by the union. Mr. Guidry contends that the investigation was insufficient to comply with the duty. Help me out with that. In what respects was it insufficient? Your Honor, the investigation was insufficient because many of the key facts that the union did eventually investigate were brought up by Mr. Guidry. So, for example, if the union were advocated on his behalf, the union should have discovered that this Matthew Beliza had also been dispatched to the Cascade. But the union didn't, that didn't come up. But if it had discovered that this other man had been dispatched, I think from Boston, Beliza, it might have discovered that this ship ordinarily operated with three engineers and that Mr. Beliza was dispatched to fill a position of engineer two instead of three, and he was the second engineer of three in the spot that Mr. Guidry had been slotted for was still open. Would it have discovered that? They might have discovered that. Well, and if they discovered that, what evidence is that, then, of discrimination? Well, it may not have been evidence of discrimination, but it certainly was evidence of their failure in their duty to represent him. So even the — Ultimately, he was — he would have, had he not thrown the job back, had the three-month position that he was promised. Is that right? The indication is that the record states that they say the position was still open. We — Well, they bought him a plane ticket. I'm sorry? They bought him a plane ticket. They did. And so — They didn't — But that was after he'd thrown back the position. If we look at the record, he threw the position. Well, but before they knew he had thrown back the position. We don't know. We can't say for certain what would have happened then. He also — he said — this part, it really — the district court said this, and I was dubious if it is in the record, but it is in the record, that he knew before he threw it back that the visa was in the mail. He said he did in his deposition. If he said he did in his deposition, then we would have to admit that. There seems to be other indication in the record as well that he did not know, and that's why he threw it back. But he said he did. He specifically said he did. If that is the case, Your Honor, then — So, I mean, so that's essentially what the union found, which is if they had just gone, he would have gotten a job, and moreover, there — so there always was a job. There always was a job the whole time, and the problem was the visa. So what do you have to say that — I mean, first of all, they don't have to be right. They just have to be — have, you know, not — have to exercise judgment and not been completely arbitrary and deletery. So how does this possibly meet the duty of fair end? Your Honor, our point is that, you know, they had to — our point is that MEBA's failure to independently verify the facts, Your Honor, it was tantamount to a decision not to investigate. This Court has — But they did interview several different people, two from the company and a couple from the union, and they — and not only that, but the employer had already done a response to the EEOC, and they had that entire response, or a lot of it, anyway, or they had all of it. So they had a lot of material, and they had — and they put together an understanding of what happened, and the understanding they came to was at least plausible. So how could they have failed their duty of fair end? Your Honor, the Supreme Court in this Court has acknowledged that there's — there's a section of types of investigation called perfunctory investigations, that those types of investigations are not — Okay, but I'm trying to understand what's perfunctory about interviewing several people and reading a whole lot of documents and coming to a conclusion that there was always a job open and that the problem was that the visa was delayed in Brazil and that if he hadn't thrown the job back, he would have had it. That's what's your conclusion, right? Your Honor, the reason that it is perfunctory, the reason we come to our conclusion is that if we look at the case law, if we figure out what's going on, MEBA had a duty to represent Guidry. There is an advocacy quality to that duty. And if we look at the actions that MEBA took here, there is no advocacy in that. All right. Can you point me to any case in which this degree of investigation occurred and it was considered to be a breach of a duty of fair representation? When this degree? Yes. This degree of investigation, i.e., interviewing several people, never — they didn't miss any deadlines, and so on. And they concluded that it wasn't a meritorious grievance. Your Honor, there's no case specifically like this one. There are a number of cases where more investigation was done, more effort was invested, and it was found not to be a duty of — it was found not to be a breach. But there are no cases that this minimal level was done and it was found not to be a breach. Okay. Well, do we — Can I ask a question? Mr. Guidry was offered the job and he turned it down because he thought that he would be retaliated against on the ship as to — he filed a grievance. I only saw the conclusory allegation that he'd be retaliated against. Is there any factual matter that explains in what that retaliation would consist? No, Your Honor. There's no factual matter. Thank you. It's — Okay. We've taken you over time, just as we took your co-counsel over time. We will give you some chance for about — let's hear from the other side. Thank you, Your Honors. Good morning, Your Honors. May it please the Court. I'm Robert Weaver and it's my privilege to be before you on behalf of the MEBA. On the surface, Your Honors, the record appears to be complicated, which it often does in multiple requests from the employer. Would you keep your voice up, sir? Yes, sir. And multiple referrals from the union to fill those positions. But I think as we lay out in our papers, Your Honors, that even viewing the factual record in the light favorable to Mr. Guidry, the district court properly resolved what I would submit are straightforward, either Title VII or fair representation issues. How do you explain the fact that from December until February, Guidry was waiting to hear whether he's got a work visa? And as far as we know, the union had no tickler system, no follow-up system to see whether that visa was coming, and it wasn't until Guidry filed a grievance that the union woke up. What the record indicates, Your Honor, is that at the time in question, the parties were aware that there was a delay in the processing of visas by the Brazilian government. There's no evidence one way or another of whether there was any kind of tickler system or any other protocol in place for following up on visa applications. But it is clear from the record that everybody involved knew, or at least OSG and the union knew, that the Brazilian government was experiencing delays in the review of the visa applications. What about Beleza? He got his faster than Guidry. How do you explain that? He got his in 50-some days. His application was in line before Mr. Guidry's. Beleza's application was submitted. I want to say, Your Honor, in October, Mr. Guidry's application was not submitted until the end. Well, the one part of this that is pretty strange, and that the neighbor was involved in, I guess, was why they took his original passport at the beginning. He maintains that because of that he couldn't work in the meantime. So I guess the question is, number one, is there any record about why, and second of all, is it true that that prevented him from working and he could otherwise have used the passport? The record suggests that the passport was taken. I'm sorry. I did not hear you. You said the record supports that, and then you mumbled. Yes. The passport was taken from Mr. Guidry. I don't think there's any question about that in the record. Mr. Guidry makes an assumption about Mr. Beleza having his passport. We know that Mr. Beleza was on another vessel. I guess it's a safe assumption that he, in fact, had his passport because he was on another vessel. There's no evidence in the record, one way or the other, whether Mr. Beleza actually had his passport. But on the question of whether that prevented Mr. Guidry from working, there's testimony from Mr. Nolan, the MEBA official, that Mr. Guidry could have performed local work, what's referred to in the papers in the deposition as either night work or port work, without his passport. That was available to him. Could he have? Night work or port work in Brazil? No, locally, Your Honor, in Oakland, where Mr. Guidry resides. But if he had gone to them and said, you know, you don't need my passport right now, can I have it back, could he have then used it to work? My understanding is he couldn't have until he was already assigned a job. Is that right or wrong? I don't think there's any evidence one way or the other, Your Honor, as to what work the passport would have enabled him to perform, other than the local work, the port work or the night work, as it's referred to. Is there something in the record about the local work or the port work or the night work that tells us whether people with his qualifications would do that work? Are you saying, well, you're qualified to be an attorney, but listen, you can be a janitor while you wait for your job. I mean, tell me about this local or night work or port work. Mr. Nolan, the MEBA official, testified in his deposition that Mr. Guidry could have performed port work. No, I understand that. My question is not that. My question is, tell me about the nature of the work and whether someone with Mr. Guidry's qualifications would ordinarily do such work. I think the record will reflect from his work history, which are some of the documents in the record, that that's the type of work, in addition to ship work, in addition to sailing, Mr. Guidry had performed a great deal of port work, of night work. And I didn't understand why, as I understood your brief, you were essentially buying into the notion that the — whether the employer had discriminated was part of a case against MEBA. And you spent most of your time dealing with the McDonnell-Douglas standards as applied to the employer. Why are we doing that? Well, Your Honor, the — it was certainly a question from the outset as to why frankly the claim had been pled in the way it was against the union if, in fact, the complaint was that, as Mr. Guidry suggested in his constructive discharge or retaliation claim, that in fact his — the real complaint was the delay. All right. So why isn't that your defense, that this is a case against the union and the union didn't do the things that he's complaining about? The employer did. Well, because ultimately, Your Honor, we were responding to it in — responding to it in the — in the method the district court addressed it under the Title VII of both the McDonnell-Douglas and the Beck analysis and reached the fair representation claim, even though that was not specifically pled in the amended complaint. I understand, but it doesn't make — to me, it doesn't make any sense. I don't understand why we would be doing that as opposed to trying to figure out whether the union violated Title VII by doing something. In the district court, Your Honor, of course, Mr. Guidry was initially pro se. He was represented at the end by other counsel. We responded with — Well, let me put it another way. Do you — the best I can figure out is that there's some notion that if the employer was acting discriminatorily and MEBA didn't prevent it, there's a Title VII action against MEBA. Do you believe that? That appears to be the claim. I understand. Is there a claim like that? Not aware of any authority for that proposition, Your Honor. The — ultimately, I think the question — the real question is whether there was a failure of the MEBA to represent Mr. Guidry. And from the first point, from the very first time that he complained, even before filing agreements, from the first time he came to the union and complained about the delay, the union took action. They contacted OSG to find out what was going on. During that period of time, the process was entirely in the hands of the Brazilian government Mundi Visas, the company retained by OSG, to process the visa applications. But there was never a failure on the part of the union to take any action. And what I think the analysis really is, as Your Honors pointed out in questioning to Mr. Guidry's counsel here, is whether or not there was a failure to represent Mr. Guidry in a — to the extent that would make out a viable fair representation claim, or perhaps a discrimination claim under the BEC, this Court's BEC analysis of union conduct under Title VII. What's the union's BEC analysis? I'm sorry. I'm sorry? What do you mean by the union — the circuit's BEC — under Title VII? Yes. The District Court analyzed Mr. Guidry's claim both under the McDonnell-Douglas — under the McDonnell-Douglas standard as a hiring decision, even though, of course, the hiring decision was OSG's and not the union's. But the District Court also applied the BEC decision from this Court relating to — That's right. — relating to union conduct. Again, ultimately, I think Your Honors — Judge Berzon asked you, what does that case say? Yeah. What does this case — what does the case say? It's similar to the — it's similar to the fair representation analysis, and that is, it requires the discrimination plaintiff to identify a similarly situated comparator. And as Judge Breyer found below, Mr. Guidry cannot do that, because if his comparator is Mr. Beleza, then Mr. Beleza never went to the vessel without a Brazilian visa. Neither could — neither could board the vessel without a Brazilian visa. Mr. Beleza didn't. Mr. Guidry couldn't. Mr. Beleza went. Ultimately, Mr. Guidry would have if he had accepted the position. But so that — so the conclusion of the District Court, and I think it's correct under the law, is that there was, in fact, no comparator. Whether you apply the BEC decision, Title VII analysis, or the fair representation analysis, there's no comparator. Therefore, Mr. Guidry cannot identify a similarly situated non-minority who was treated differently or treated better by the union, and that, again, is the key. The defendant here is the union, not OSG. Well, isn't this claim that Beleza got better action out of the union and got his Brazilian work permit faster than Guidry? And that was completely the responsibility and the conduct of the Brazilian government and Mundi Visas, the vendor used by OSG, to get the visa. The union's role is simply a conduit to pass paperwork from the employee to OSG, who then passes it on to the vendor and the Brazilian government for processing. Okay. You've used up your time, and if you have one or two sentences to sum up, but you're finished. No, Your Honor, unless Your Honors have any further questions. Okay. Thank you. Thank you, sir. Now, Mr. Guidry's attorneys had sought to save two minutes. We took you over. We'll give you — if you'd please put two minutes on the clock. But I will also say this for you as students. I am uncommonly lenient, and the next time you get an oral argument, do not anticipate that the judge will give you rebuttal time that you've already used. And thank you very much for doing this. Yeah, yeah, yeah. And, Your Honors, if it's acceptable, I will be doing all of the rebuttal, so we don't have to waste time switching. All right. There are a number of issues that need to be raised. But first of all, the idea that Mr. Guidry could have taken a port job while he was waiting for his visa. If you look at ER 11, page 270, which is the MEBA shipping rules, Section 11B specifically states, anyone who has cleared for a shipping job shall not be eligible for a port relief job, regardless of the starting date of the shipping job. He could not have taken a port job in the interim while waiting for his visa. That had nothing to do with his passport, right? I'm sorry? That had nothing to do — I mean, it had something to do with the passport, but it wasn't because he didn't physically have the passport. Correct. But the idea that he — I mean, the one thing here that seemed quite irregular was that he didn't have the passport. What difference does that make? Well — I mean, it appeared — it could have been just a mistake, but it doesn't appear like they needed the passport all that time. Right. For a port job, he didn't need a passport, but the MEB shipping rules say that he couldn't have worked a port job. I understand that, but I'm asking you what? Did the fact that he didn't physically have his passport negatively impact him in any way other than the delay? Absolutely. He couldn't take an interim dispatch. Well, could he have taken an interim dispatch? Not that required a passport. Well, even if it didn't require — if it did require a passport, if he'd had his passport, could he have taken an interim position once he had an assignment? Absolutely. Mr. Beliza did. I'm sorry, what? Mr. Beliza took one. He was sent to the Anacortes for a 75-day — No, he was — my understanding is that he was directly contacted by the company because he was already on one of their ships. Right? Correct. He wasn't — he wasn't taking a job while he was waiting for another job. If he had taken a job while he was waiting for another job, then he wouldn't have been ready for the other job. Our understanding is the reason he was sent to get his — to apply for his Brazilian visa was so that he would be available to take the job. There's no evidence to the record whether or not he knew that. I can't speak to that. Okay. Thank you very much. And I would like to reiterate what Judge Berzon said, and I'm sure Judge Bea feels. We're very grateful for you to take on this case. For Bono, we've had Dr. Curtis's students here before, and we will welcome them again. A very nice job. Thank you very much. I would compliment you, but you didn't do it for free. Thank you, Your Honor. But you did a fine job. The case of Guidry v. Marine Engineers Beneficial Association now submitted for decision.
judges: Fletcher, Berzon, Bea